IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| THOMAS ROBERTS, ) | |
| ) | |
| Plaintiff, ) | **CIVIL ACTION** |
| ) | |
| v. ) | No.  05-1325-MLB |
| ) | |
| CESSNA AIRCRAFT COMPANY, ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM AND ORDER**

This case arises under the Americans with Disabilities Act, 42 U.S.C. § 12101 <u>et seq.</u>  Plaintiff Thomas Roberts asserts that defendant failed to accommodate his disability, intentionally placed him in a position that he was unable to perform and retaliated against him in violation of the ADA.

This case comes before the court on defendant's motion for summary judgment (Doc. 46).  The motion has been fully briefed and is ripe for decision.  (Docs. 47, 52, 59, 65, 66).  Defendant's motion is granted, for the reasons herein.[1]

**I. FACTS**

Since birth, plaintiff's vision in his left eye has been 20/200 and uncorrectable.  Plaintiff has 20/20 corrected vision in his right eye.  Even with his limitations in his left eye, plaintiff is able to

---

[1] Plaintiff filed a motion to strike the affidavit of Dr. Wilkenson and any argument in defendant's reply that was not presented in defendant's initial briefing. (Doc. 61). Plaintiff appears to assert that any argument in defendant's reply based on Dr. Wilkenson's affidavit is hearsay and/or improper expert testimony. Since the court did not rely on Dr. Wilkenson's affidavit in its ruling, plaintiff's motion to strike is denied as moot.

complete normal daily activities, including driving a vehicle. Plaintiff's vision precludes him from flying, working on detailed model airplanes and occasionally causes him to bump into walls or miss an attempt to grasp an object. (Docs. 47 at 2; 52 at 1; 65 at 9-10).

Plaintiff began his employment with defendant in 1995. In the beginning, plaintiff was employed as a Sheet Metal Assembler for approximately 4 months. Plaintiff was then transferred to a position in one of the stockrooms at defendant's plant. In 1998, plaintiff was treated for carpal tunnel syndrome. Plaintiff was permanently restricted from using a hand scanner for more than 4 hours in an eight hour day. In early 2002, plaintiff took a leave of absence and had hernia surgery. Until his leave of absence, plaintiff was employed in the stockroom. (Docs. 47 at 3-4; 52 at 2-3; 65 at 10-11).

On February 13, 2003, defendant administered a Functional Capacity Evaluation (FCE) to determine plaintiff's ability to lift, push and pull.[2] The FCE determined that plaintiff could lift (floor to waist) forty pounds, lift (overhead) twenty-five pounds, carry fifty pounds, push thirty-nine pounds and pull thirty-eight pounds occasionally. (Docs. 47 at 3-4, exh. 3; 52 at 3; 65 at 11).

After performing the FCE, plaintiff was automatically placed on defendant's recall list for certain stock room and Sheet Metal Assembler positions. Defendant placed plaintiff on recall for these positions pursuant to the Collective Bargaining Agreement (CBA) which

---

[2] Plaintiff objects to the admissibility of the FCE on the basis that it is hearsay. The FCE, however, is a part of plaintiff's health services file at Cessna and both parties have stipulated to its admissibility in the pretrial order. (Pretrial Order at 2-3; Doc. 59 at 2).

-2-

requires defendant to place an employee on recall for all positions that employee has held during his or her employment with defendant. On August 27, 2004, Dr. Barcelo called plaintiff and informed him that a position was available as a Sheet Metal Assembler. Dr. Barcelo asked plaintiff if he could perform the job given his prior restrictions for his carpal tunnel syndrome. Plaintiff agreed to take the position. (Docs. 47 at 4-5; 52 at 3-4; 65 at 12).

Prior to the recall for the Sheet Metal Assembler position, defendant had various openings for different stockroom positions. Defendant, however, did not recall plaintiff to those positions. On each position, the job summaries required the employee to be able to push/pull and lift more weight than plaintiff's FCE allowed.[3] (Docs. 52 at exh. D; 59 at 9-10).

Plaintiff returned to work and received six hours of training. Plaintiff made many mistakes and received an excessive number of Rejection Disposition Reports (RDR's) and Standard Repairs (SR's) which required employees to make corrections to the parts. Plaintiff was given additional training in an attempt to improve his performance. On October 13, plaintiff informed Pollock that he needed new glasses that he had ordered through his optometrist to continue working. Plaintiff was allowed to leave work and return when his

---

[3] Plaintiff asserts that these facts are controverted because he has never had to lift more than 50 pounds and his job description does not require an employee to lift more than 50 pounds. (Doc. 52, exh. G). That job description, however, was for plaintiff's position in department 57 that he performed prior to his leave. That position was not available during plaintiff's leave. The positions that were available during plaintiff's leave (departments 10, 52, 152 and 702) had different job descriptions and were located in different stockrooms. (Doc. 52, exh. D).

-3-

glasses arrived. (Docs. 47 at 5-8; 52 at 4; 65 at 13).

On October 18, 2004, plaintiff was issued a Disciplinary Action Form by Jim Pollock, plaintiff's supervisor, for causing three RDR's. The form stated that plaintiff's performance was unacceptable and could lead up to suspension and/or termination. Plaintiff filed a grievance in response to the Disciplinary Action Form and asked it to be removed since it was an unjust disciplinary action due to the fact that he had only been in the position for one month. On October 21, 2004, plaintiff was issued another Disciplinary Action Form by Pollock for accomplishing only 5.6 hours of work in twenty-four hours and causing two RDR's. The form again stated that the performance could result in termination. Plaintiff filed a grievance in response and again stated that it was unjust due to his short time in the position. On November 2, 2004, Roberts was issued a Disciplinary Action Form by Pollock for taking four days to complete a twelve hour job which was later returned by inspectors and required additional work. Plaintiff again responded with a grievance and stated that he was still learning the position. (Docs. 47 at 5-8; 52 at 4; 65 at 13).

During the two month period that plaintiff worked as a Sheet Metal Assembler, plaintiff repeatedly requested a transfer into a stockroom position. Plaintiff made verbal requests to Pollock, Penny Gilbert and Dr. Barcelo. Defendant did not grant plaintiff's transfer requests. (Docs. 47 at 8-9; 52 at 8; 65 at 13).

On November 3, 2004, plaintiff was issued a Disciplinary Action Form for causing two RDR's and seven SR's on the same job. Defendant terminated plaintiff's employment at that time. On November 8, 2004, plaintiff filed a grievance in response to his termination. Plaintiff

-4-

stated that he was terminated for doing a job that was physically difficult for him to perform. (Docs. 47 at 8; 52 at 5).

**II.   SUMMARY JUDGMENT STANDARD**

The rules applicable to the resolution of this case, now at the summary judgment stage, are well-known and are only briefly outlined here.  Federal Rule of Civil Procedure 56(c) directs the entry of summary judgment in favor of a party who "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c). An issue is "genuine" if sufficient evidence exists "so that a rational trier of fact could resolve the issue either way" and "[a]n issue is 'material' if under the substantive law it is essential to the proper disposition of the claim." Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 670 (10th Cir. 1998).  When confronted with a fully briefed motion for summary judgment, the court must ultimately determine "whether there is the need for a trial–whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986).  If so, the court cannot grant summary judgment. Prenalta Corp. v. Colo. Interstate Gas Co., 944 F.2d 677, 684 (10th Cir. 1991).

**III. ANALYSIS**

    **A.   Failure to Accommodate**

The ADA requires an employer to make reasonable accommodation to the known physical or mental limitations of a qualified individual with a disability.   42 U.S.C. § 12112(b)(5)(A). The "analytical

-5-

framework" first pronounced in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) applies to causes of action under the ADA. MacKenzie, 414 F.3d at 1274. Because plaintiff presents no direct evidence of discrimination but instead relies on indirect evidence, he has the initial burden of establishing a prima facie case. See McDonnell Douglas, 411 U.S. at 802. If plaintiff does so, then defendant must "articulate some legitimate, nondiscriminatory reason" for the challenged personnel action. Id. Plaintiff then bears the ultimate burden of demonstrating that defendant's stated reason is in fact a pretext for unlawful discrimination and, therefore, unworthy of belief. See id. at 804. The court need not reach steps two and three of the McDonnell Douglas framework on plaintiff's failure to accommodate claim, however, because plaintiff fails to set forth sufficient evidence to establish a prima facie ADA claim.

### 1. DISABILITY

Plaintiff must first establish that he has a disability. The term "disability" is defined by section 12102(2) of the ADA as: 1) "a physical or mental impairment that substantially limits one or more of the major life activities of such individual"; 2) "a record of such an impairment"; or 3) "being regarded as having such an impairment."

#### a. Physical Impairment

An analysis under the first category in the definition of "disability" requires a three-step process. MacKenzie, 414 F.3d at 1275. First, the court must consider whether plaintiff suffers from a physical impairment. Second, the court must identify the life activity upon which plaintiff relies and determine whether it constitutes a major life activity under the ADA. Third, the court

-6-

must determine if plaintiff's impairment substantially limits the major life activity. Whether plaintiff has an impairment within the meaning of the ADA is a question of law. Whether the conduct affects a major life activity is also a legal question. "However, ascertaining whether the impairment substantially limits the major life activity is a factual question." Doebele v. Sprint/United Management Co., 342 F.3d 1117, 1129 (10th Cir. 2003).

Plaintiff specifically asserts that he suffers from a physical impairment, blindness in his left eye, that substantially limits the major life activity of seeing. (Pretrial order, Doc. 37 at 4.) Defendant does not dispute that plaintiff has a physical impairment. The court finds that plaintiff has met his burden under this first stage of the definition of disability.

The term "major life activity" is defined by EEOC regulations. It includes "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i). Seeing is listed as a major life activity. Thus, plaintiff has also met his burden under the second stage of the definition of disability.

Therefore, the question that remains is whether plaintiff's vision impairment in his left eye "substantially limits" the major life activity of seeing. While this is a factual question, the court may decide this issue on summary judgment if plaintiff has failed to create a factual issue. Doebele, 342 F.3d at 1130. The term "substantially limits" is also defined within EEOC regulations. In order to establish that he is substantially limited in the major life activity of seeing, plaintiff must establish that he is unable to see

or is significantly restricted in his ability to see as compared to the average person in the general population. Id. There are three factors used to determine whether an impairment substantially limits a major life activity: 1) the nature and severity of the impairment; 2) the duration or expected duration of the impairment; and 3) the permanent or long term impact resulting from the impairment. Sutton v. United Air Lines, Inc., 130 F.3d 893, 900-901 (10th Cir. 1997)(citing 29 C.F.R. § 1630.2(j)(1)). The word "substantially" in the phrase "substantially limited" means "considerable" or "to a large degree." Toyota Motor Mfg., Kentucky, Inc. v. Williams, 534 U.S. 184, 196 (2002).

Plaintiff asserts the following to support the argument that he is substantially limited in seeing:

> Plaintiff suffers from monocular vision, no depth perception and that he cannot see straight. PSOF 2-3. These and the facts set forth in PSOF 2 and 3 create a triable issue of fact as to plaintiff being substantially impaired in the major life activity of seeing. Studies of monocular vision indicate that it often substantially limits vision. Most studies agree that the most significant limitations of monocular vision are reduced field of vision and lack of binocular depth perception. See, e.g., A. J. McKnight et al., The Visual and Driving Performance of Monocular and Binocular Heavy-Duty Truck Drivers, 23 Accid. Anal. & Prev. 225 (1991). With respect to visual field, one study found that, on average, persons with monocular vision had a visual field of 145 degrees as compared to 173 degrees for persons with binocular vision. Id. at 231. That study concluded that this difference was "obviously highly significant both statistically and practically." Ibid. Persons with monocular vision also lack binocular depth perception. Binocular vision enables persons to achieve "stereopsis," i.e. to see objects in three dimensions. See Hugh Davson, The Physiology of the Eye 351 (2d Ed. 1963); Samuel L. Fox, Industrial and Occupational Ophthalmology 23 (1973). One can clearly see how limiting plaintiff's impairment is if one simply puts ones hand over his/her left eye and looks forward.

(Doc. 52 at 15-16).

During his deposition, when asked how plaintiff's vision prevented him from doing activities, plaintiff responded as follows:

> I can't fly an airplane, I do modeling model airplanes, it's extremely difficult to do detail work on a mode airplane when you've only got one eye. If I get real close to it to do it, my eyes cross. My left eye tries to help, my eyes cross, so I have to back off. And if I do real detailed work, if I'm painting this line over here, I might actually be painting over here, I'll just miss it all together, you know, that's just something in recreation I do. If I'm walking down a hallway and a door's open, I'll jerk out of the way because I think I'm going to hit it, but I'm not. It's just, you know, little things like that. I'll reach for a glass and sometimes I'll miss the glass. It doesn't happen because I'm 50 years old and I've had this for 50 years, so I've adjusted. But it does happen.

(Doc. 47 exh. 1 at 115).

In an affidavit, prepared after his deposition, plaintiff states that he is unable to do simple tasks which require depth perception and cannot see if someone places a dark paper or hand in front of his left eye. (Doc. 55 exh. 2). Defendant focuses on the fact that plaintiff is able to do many daily activities and, therefore, concludes that he is not disabled.

The Supreme Court in Alberton's, Inc. V. Kirkingburg, 527 U.S. 555, 119 S. Ct. 2162 (1999), stated the following:

> While monocularity inevitably leads to some loss of horizontal field of vision and depth perception,FN12 consequences the Ninth Circuit mentioned, see 143 F.3d, at 1232, the court did not identify the degree of loss suffered by Kirkingburg, nor are we aware of any evidence in the record specifying the extent of his visual restrictions.
>
> FN12. Individuals who can see out of only one eye are unable to perform stereopsis, the process of combining two retinal images into one through which two-eyed individuals gain much of their depth perception, particularly at short distances. At greater distances, stereopsis is relatively less important for depth perception. In their distance vision, monocular individuals are able to compensate for their lack of stereopsis to varying degrees by relying on

> monocular cues, such as motion parallax, linear perspective, overlay of contours, and distribution of highlights and shadows. See Von Noorden, supra n. 2, at 23-30; App. 300-302.
>
> This is not to suggest that monocular individuals have an onerous burden in trying to show that they are disabled. On the contrary, our brief examination of some of the medical literature leaves us sharing the Government's judgment that people with monocular vision "ordinarily" will meet the Act's definition of disability, Brief for United States et al. as Amici Curiae 11, and we suppose that defendant companies will often not contest the issue. We simply hold that the Act requires monocular individuals, like others claiming the Act's protection, to prove a disability by offering evidence that the extent of the limitation in terms of their own experience, as in loss of depth perception and visual field, is substantial.

Kirkingburg, 527 U.S. at 566-67.

According to the Supreme Court, individuals such as plaintiff will usually meet the definition of disability if they have experienced substantial loss in depth perception and visual field. Plaintiff has testified that he has no depth perception, cannot see straight, occasionally fails to grasp objects and bumps into walls. The court finds that plaintiff has raised a genuine issue of material fact as to whether his vision substantially limits his seeing and thus a major life activity.

### 2. Reasonable Accommodation

Defendant argues that even if plaintiff is disabled, plaintiff cannot demonstrate that defendant failed to reasonably accommodate him. Plaintiff asserts that a reasonable accommodation would have been for defendant to transfer plaintiff to a position in the stockroom. "[An] employer must take reasonable steps to reassign a qualified individual to a vacant position or a position the employer reasonably anticipates will become vacant in the fairly immediate

-10-

future." Albert v. Smith's Food & Drug Centers, Inc., 356 F.3d 1242, 1252 (10th Cir. 2004). Defendant responds that a transfer to a vacant position was unreasonable because it would violate the CBA terms. The CBA does not allow transfer into a position unless the recall lists for those positions have been fully exhausted. At the time of plaintiff's requests, the recall lists had not been exhausted. (Doc. 47 at 9-10).

The ADA does not require an employer to provide an accommodation that would violate a CBA.[4] Dilley v. SuperValu, Inc., 296 F.3d 958, 963 (10th Cir. 2002)(citing U.S. Airways, Inc. v. Barnett, 535 U.S. 391, 394, 122 S. Ct. 1516, 1519, 152 L. Ed.2d 589 (2002)("[T]o show that a requested accommodation conflicts with the rules of a seniority system is ordinarily to show that the accommodation is not 'reasonable.'"); Aldrich v. Boeing Co., 146 F.3d 1265, 1272 n. 5 (10th Cir. 1998) ("[H]ad Boeing transferred Aldrich to any of the last three disputed jobs ··· it would have violated the seniority provisions of the collective bargaining agreement."); Milton v. Scrivner, Inc., 53 F.3d 1118, 1125 (10th Cir. 1995) ("[P]laintiffs' collective bargaining agreement prohibits their transfer to any other job because plaintiffs lack the requisite seniority.").

Since plaintiff has failed to establish that his requested transfer was a reasonable accommodation under the ADA, defendant's motion for summary judgment is granted on this claim.

---

[4] Plaintiff asserts that the CBA allows defendant to accommodate plaintiff in violation of the transfer provision. The CBA, however, states that the terms of the CBA will be followed consistent with the ADA. (Doc. 47, exh. 5 at Bates stamp A00741). Since the ADA does not require defendant to violate the transfer terms than that provision is consistent with the ADA.

-11-


**B.     Intentional Placement**

Plaintiff also claims that defendant placed him into a position as a Sheet Metal Assembler knowing that plaintiff's disability precluded him from performing the position.  In order to establish this claim, plaintiff must show "(1) that he is disabled within the meaning of the ADA; (2) that he is qualified, with or without reasonable accommodation, to perform the essential functions of the job held or desired; and (3) that he was discriminated against because of his disability." Davidson v. Am. Online, Inc., 337 F.3d 1179, 1188 (10th Cir. 2003).  Defendant asserts that plaintiff has failed to establish that defendant discriminated against him since he cannot show that any decision maker had knowledge that plaintiff's disability would preclude him from adequately performing the position of Sheet Metal Assembler.

Plaintiff responds that defendant knew that plaintiff could not perform the job of Sheet Metal Assembler since his health file noted his blindness in his left eye.  Plaintiff, however, had performed the job of Sheet Metal Assembler in 1995 for a period of four months. Plaintiff had the same vision difficulties during 1995.  Defendant placed plaintiff in that position since it was the first available position and plaintiff had worked in that position during his employment at the plant.  Defendant's doctor called plaintiff to question whether his carpal tunnel restrictions would affect his performance and specifically asked plaintiff if he could do the job. Plaintiff accepted the job and apparently did not voice any concerns about his vision.  The court finds that plaintiff has failed to make a prima facie case under the ADA.

Defendant's motion for summary judgment on plaintiff's claim for intentional discrimination under the ADA is granted.

### C. Retaliation

Finally, plaintiff asserts a claim of retaliation against defendant. Plaintiff claims that defendant fired him in retaliation for protected activity under the ADA. In order to establish a claim for retaliation under the ADA, plaintiff must show (1) that he engaged in an activity protected by the statute; (2) that he was subjected to an adverse employment action subsequent to or contemporaneous with the protected activity; and (3) that there was a causal connection between the protected activity and the adverse action. Selenke v. Medical Imaging of Colo., 248 F.3d 1249, 1264 (10th Cir. 2001).

The first element requires that plaintiff participated in a protected activity. Plaintiff asserts that his protected activity is the filing of a discrimination charge on April 9, 2004, and the request for accommodations on October 13, 2004. Both filing an EEOC claim and requesting accommodation are protected activities. See Anderson v. Coors Brewing Co., 181 F.3d 1171, 1178 (10th Cir. 1999)(filing charge); Butler v. City of Prairie Village, Kan., 172 F.3d 736, 751-52 (10th Cir. 1999)(requesting accommodation).

Plaintiff's charge on April 9, stated that defendant regarded him as disabled in his lifting restrictions and refused to allow him to return to work in the stockroom. After filing this charge, defendant allegedly refused to place plaintiff in different stockroom positions that were available. Positions became available on May 24 and 26, and July 21 and 23. Defendant than placed plaintiff in the Sheet Metal Assembler position in August. Plaintiff's formal request for transfer

occurred on October 13. On October 18, plaintiff was issued a disciplinary action form. Ultimately, plaintiff was fired on November 3.

The Tenth Circuit liberally defines the phrase "adverse employment action." Anderson, 181 F.3d at 1178. The court is to "take a case-by-case approach in determining whether a given employment action is "adverse." Id. The court finds, for purposes of summary judgment only, that defendant's refusal to place plaintiff in a stockroom position, plaintiff's disciplinary action and termination constitute adverse actions.[5] The court must now consider whether plaintiff has established a causal connection between the protected activity and adverse action.

"A causal connection may be shown by evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action." O'Neal v. Ferguson Constr. Co., 237 F.3d 1248, 1253 (10th Cir. 2001). "Unless there is very close temporal proximity between the protected activity and the retaliatory conduct, the plaintiff must offer additional evidence to establish causation." Id. The Tenth Circuit has "held that a one and one-half month period between protected activity and adverse action may, by itself, establish causation. By contrast, [it has] held that a three-month period, standing alone, is insufficient to establish causation." Anderson, 181 F.3d at 1179 (citations omitted). Based on the close temporal proximity of plaintiff's EEOC charge and request

---

[5] Based on the record, the court doubts that plaintiff would be able to prove to a jury that defendant's actions were adverse or the existence of a causal connection.

for accommodations to the adverse actions, the court finds that plaintiff has satisfied his burden of establishing causation.

The burden then shifts to defendant to demonstrate a legitimate non-discriminatory reason for its actions. Defendant has asserted that it did not place plaintiff in the different openings for stockroom clerk because those positions required plaintiff to lift and pull in excess of his FCE. Defendant's reasoning for issuing the disciplinary action forms and plaintiff's ultimate termination was due to his poor performance. The court finds that defendant has satisfied its burden.

The burden now shifts back to plaintiff to show that defendant's reasons are a pretext for discrimination. A plaintiff may show pretext by demonstrating "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." Morgan v. Hilt, Inc., 108 F.3d 1319, 1323 (10th Cir. 1997). Plaintiff asserts that defendant's requirements for the stockroom positions were "bogus" and close in time to his EEOC charge. (Doc. 52 at 27). At this stage, "temporal proximity is insufficient, standing alone, to create an issue of fact" as to whether defendant's explanation for not placing plaintiff in the stockroom positions was pretextual. Selenke, 248 F.3d at 1266. Plaintiff's claim that the descriptions of the stockroom jobs are "bogus" is also insufficient to create a triable fact. The positions that were reviewed were not positions that plaintiff had worked in the

-15-

past. Accordingly, plaintiff's opinion that the position does not require an employee to lift a certain weight is not relevant. Plaintiff has failed to put forth any evidence that defendant inflated the numbers so that plaintiff would be unable to work those positions or that ". . . Defendant placed lifting restrictions upon plaintiff in fear that he would again injure himself and have another Hernia [sic]." (Doc. 65 at 17).[6] There is no evidence that defendant regarded plaintiff as disabled in lifting.

Plaintiff has also failed to put forth any evidence of pretext on his claim that defendant retaliated against him for requesting accommodations. While the adverse actions were close in time to his request, plaintiff cannot rest on this fact alone. Moreover, plaintiff readily admits that he made the errors that resulted in the disciplinary action form and his ultimate termination.

Therefore, the court finds that plaintiff has failed to establish the existence of a triable fact on his claim for retaliation. Defendant's motion for summary judgment on plaintiff's retaliation claim is granted.

**IV.  CONCLUSION**

Defendant's motion for summary judgment (doc. 46) is granted.

A motion for reconsideration of this order is not encouraged. Any such motion shall not exceed 3 double-spaced pages and shall strictly comply with the standards enunciated by this court in <u>Comeau v. Rupp</u>, 810 F. Supp. 1172, 1174 (1992). The response to any motion

---

[6] This is but one example of plaintiff's failure to recognize that summary judgment cannot be defeated by argument which is unsupported by facts.

for reconsideration shall not exceed 3 double-spaced pages.  No reply shall be filed.

    IT IS SO ORDERED.

    Dated this __11th__ day of April 2007, at Wichita, Kansas.

                                        s/ Monti Belot
                                        Monti L. Belot
                                        UNITED STATES DISTRICT JUDGE